IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>METAMORPHIX, INC., *et al.,*<br><br>Debtors. | Chapter 11<br>Case Nos. 10-10273 (MFW), *et seq.*<br>(jointly administered)<br><br>**Hearing date: January 25, 2011, 10:30 a.m.**<br>**Objection deadline: January 21, 2011, 4:00 p.m.** |

**DEBTORS' MOTION FOR (I) APPROVAL OF
SOLICITATION PROCEDURES, BIDDING PROCEDURES, SALE PROCEDURES,
INCLUDING FORM AND MANNER OF NOTICE OF SALE, AND PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT, OR IN THE ALTERNATIVE REJECTION,
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS; (II)
APPROVAL OF ASSUMPTION AND ASSIGNMENT, OR IN THE ALTERNATIVE
REJECTION, OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III)
APPROVAL OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND OTHER ENCUMBRANCES**

MetaMorphix, Inc. ("MMI") and MMI Genomics, Inc. ("MMIG," and collectively with MMI, the "Debtors"), as debtors and debtors in possession, by their undersigned attorneys, file this Motion for:

(i)     Approval of Solicitation Procedures, Bidding Procedures, Sale Procedures, Including Form and Manner of Notice of Sale, and Procedures for the Assumption and Assignment, or in the Alternative Rejection, of Executory Contracts and Unexpired Leases of the Debtors;

(ii)    Approval of Assumption and Assignment, or in the Alternative Rejection, of Executory Contracts and Unexpired Leases; and

(iii)   Approval of Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Other Encumbrances,

In support hereof, the Debtors state as follows:

<u>JURISDICTION</u>

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>BACKGROUND</u>

2.     On January 28, 2010 (the "Petition Date"), a bankruptcy case was commenced against MMI by the filing of an involuntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). On September 30, 2010 (the "Order for Relief Date"), the Court entered an Order for Bankruptcy Relief in connection with MMI and the case was converted to a case under Chapter 11 of the Bankruptcy Code. On November 18, 2010 (the "MMIG Petition Date"), MMIG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Order for Relief Date and the MMIG Petition Date, respectively, the Debtors have managed their affairs and remained in possession of their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.     On December 9, 2010, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases.

4.     The Debtors are Delaware corporations that own and license bio-technology, as well as provide services in the human and animal genomic industries. Additionally, they have developed partnerships and contracts with industry leaders in the commercial food and pet markets.

5.     Over the past ten years, the Debtors issued a series of convertible debt notes, some of which have been converted into equity and others of which have been re-issued as newer series notes. Specifically, there remain a series of 12.5% convertible secured notes (the "12.5% Notes") and a series of 10% secured convertible notes (the "10% Notes," and collectively with the 12.5% Notes, the "Notes") The 12.5% Notes are secured by a senior lien on the Debtors' assets, and the 10% Notes secured by a junior lien. The Notes were expected to be converted into common stock upon execution of an IPO, which did not occur.

6.     Together, the Debtors' outstanding indebtedness under the 10% Notes and 12.5% Notes total approximately $56 million in principal and interest.  As a consequence of a failed IPO, in December 2008, the Debtors asked the note holders to extend the maturity date of the Notes to January 2010. Over 80% of the Notes currently have maturity dates of January 2010 or beyond. At present, although the holders of approximately $8.5 million of the Notes refused to agree to maturity date extensions and all of these Notes are already past due, no collection or enforcement actions have been pursued outside of this Court.  Rather, while restructuring negotiations had been actively underway, in January 2010, certain of the holders of the 10% Note filed a petition for involuntary relief against MMI.

7.     Other than the holders of the Notes (each a "Secured Creditor," and collectively, the "Secured Creditors"), the Debtors do not believe that any other creditor asserts liens, security interests, mortgages, or other secured claims against the Debtors' assets or their estates.

8.     On January 5, 2011, the Debtors filed a motion to approve that certain Settlement Agreement between the Debtors and Branhaven, LLC ("Branhaven") as collateral agent for those 12.5% Noteholders" (Docket No. 214) in accordance with §§ 105(a) & 363(b) of the Bankruptcy Code and Fed. R. Bankr. P. 4001 and 9019.  If the Settlement Agreement is approved and the agreed relief is consummated, the Debtors' operating assets will be transferred to a receiver directed by Branhaven, which will operate the assets until a secured party's sale can occur.  This Motion is being filed in the event that the Settlement Agreement is not approved by this Court.

EFFECT OF BRANHAVEN SETTLEMENT AGREEMENT

9.     The Debtors have previously filed a motion to approve a settlement agreement (the "Settlement Agreement") between them and Branhaven, LLC as collateral agent for the holders of 12.5% promissory notes ("Branhaven").  If approved, the Settlement Agreement provides that substantially all of the Debtors' assets, which represent Branhaven's collateral, will

be placed into receivership.  Therefore, the relief requested in this motion shall be presented to the Court only in the event that the Court does not approve the Settlement Agreement.

RELIEF REQUESTED

10.    By this Motion, the Debtors request entry of two separate orders, to be considered at two successive hearings.

11.    First, the Debtors seek the entry of an order (the "Procedures Order"), substantially in the form of **Exhibit A** attached hereto, approving the form and manner of notice of the proposed sale and bidding procedures, and scheduling certain events and deadlines in connection with the proposed sale.  The Procedures Order will also establish deadlines by which parties must object to the sale, to the assumption, assignment, or rejection of executory contracts and unexpired leases, and to the proposed cure amounts, if any, in connection therewith.  Finally, the Procedures Order will schedule the date and time of a hearing to consider final approval of the Debtors' proposed sale, including but not limited to proposed assumption and assignment, or rejection, of any executory contracts and unexpired leases.

12.    Second, the Debtors seek the entry of an order approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests, and other encumbrances (the "Sale Order"), substantially in the form of **Exhibit B** attached hereto. The Sale Order would authorize and approve the proposed sale pursuant to an agreement (obtained in accordance with the approved bidding procedures) that provides the Debtors' estates with the highest and best value for their assets and approve the assumption and assignment, or in the alternative rejection, of the Debtors' executory contracts and unexpired leases to effectuate the terms of the proposed sale.

<u>FACTUAL AND LEGAL GROUNDS FOR RELIEF REQUESTED</u>

A.     <u>INTRODUCTION</u>.

13.     As noted above, the Debtors are Delaware corporations that own and license bio-technology, as well as provide services in the human and animal genomic industries. Additionally, they have developed partnerships and contracts with industry leaders in the commercial food and pet markets.

14.     Over the past ten years, the Debtors issued a series of convertible debt notes, some of which have been converted into equity and others of which have been re-issued as newer series notes.  Specifically, there remain a series of 12.5% convertible secured notes (the "12.5% Notes") and a series of 10% secured convertible notes (the "10% Notes," and collectively with the 12.5% Notes, the "Notes")  The 12.5% Notes are secured by a senior lien on the Debtors' assets, and the 10% Notes secured by a junior lien.  The Notes were expected to be converted into common stock upon execution of an IPO, which did not occur.

15.     Together, the Debtors' outstanding indebtedness under the 10% Notes and 12.5% Notes total approximately $56 million in principal and interest.  As a consequence of a failed IPO, in December 2008, the Debtors asked the note holders to extend the maturity date of the Notes to January 2010. Over 80% of the Notes currently have maturity dates of January 2010 or beyond. At present, although the holders of approximately $8.5 million of the Notes refused to agree to maturity date extensions and all of these Notes are already past due, no collection or enforcement actions have been pursued outside of this Court.  Rather, while restructuring negotiations had been actively underway, in January 2010, certain of the holders of the 10% Note filed a petition for involuntary relief against MMI.

16.     The Debtors believe that the value of their assets are very difficult to determine, because of the complexity valuing patents and trademarks, as well as other intricate dimensions

of the Debtors' assets. Specifically, the Debtors' assets have substantial value to a buyer as an operational going concern or as a group of assets. These assets also have value to the Debtors' competitors or licensees, which might be willing to pay even more to acquire them in order to prevent other competitors from buying and using them. Furthermore, the Debtors believe that some of the potential purchasers may be interested in assuming some or all of the Debtors' existing trade debt in order to preserve the going-concern value of their current operations, while others will not. Finally, it should be noted that the Debtors do not have a large number of comparable publicly-traded companies against which to compare their relative worth.

17. Because of the multitude of uses that might be applied to the Debtors' assets, some of which may not be easily priced in the open market, the Debtors believe that the best method of realizing the highest and best value for their assets is to open the bidding to potential purchasers.

B. APPROVAL OF SOLICITATION PROCEDURES.

18. The Debtors' management, which is comprised of many individuals with decades of experience in the Debtors' industry, identified parties which, in their opinion, are likely to have an interest in bidding on the Debtors' assets (collectively, the "Potential Purchasers"). The Potential Purchasers were selected based on a number of criteria, including but not limited to the Debtors' perception of (i) their interest in acquiring, merging with, partnering with, or investing in businesses in the Debtors' industry; (ii) their interest in acquiring the skills and services of the Debtors' industry-focused management team; (iii) their interest in adding the Debtors' patents, trademarks, and related intellectual property to their portfolio; (iv) their interest in expanding their market share in the Debtors' industry; (v) their interest in preventing additional competitors from entering the Debtors' industry to replace the Debtors' business; and/or (vi) their interest in acquiring the Debtors' remaining assets.

19.     To the extent that they have not already done so, the Debtors will contact various Potential Purchasers indicating the Debtors' intention to sell substantially all of their assets free and clear of liens, claims, interests, and other encumbrances. Notices will also be sent to persons that had previously contacted the Debtors to inquire about a potential purchase of the Debtors' assets.  The Debtors have also sought to retain an investment banker, whose services may be used to locate higher and better offers in accordance with the terms of its retention. (The foregoing service of notices is referred to herein as the "Solicitation Procedures").  The Debtors therefore request that the Court approve the Solicitation Procedures as being reasonably calculated to lead to the highest and best offer for the sale of the Debtors' assets.

C.     SALE PROCEDURES.

20.     To govern the proposed sale of the Debtors' assets (the "Sale"), the Debtors propose that the Sale Procedures Order contain the following procedures, deadlines, and forms (each a "Sale Procedure," and collectively, the "Sale Procedures"):

Bidding Procedures.

(A)     Neogen Corporation will serve as the stalking horse bidder (the "Stalking Horse") and its opening bid shall be $4,000,000.00 cash plus an earnout in the amount of 20% of any revenues generated by the Myostatin patent portfolio for a period of 10 years (the "Stalking Horse Bid"). The Debtors will enter into an asset purchase agreement with the Stalking Horse mutually acceptable to the Debtors and Neogen (the "Stalking Horse APA") and file it with the Court on or before seven (7) days before the Bid Deadline.  The Stalking Horse Bid is contingent upon the approval of the bid procedures set forth herein, entry of a sale order in a form acceptable to Neogen Corporation and confirmation of the Debtors' total service revenues.

(B)     In the event that (i) the Stalking Horse Bid is overbid, and (ii) the Court has entered an order approving the winning bid and such order has become final and nonappealable, the Debtors have agreed, subject to the Court's approval, to a breakup fee of 3.5% of the Stalking Horse Bid (the "Breakup Fee"), to be paid to the Stalking Horse from the proceeds of the winning bid, provided that such transaction actually closes.   Additionally, in the event a winning bid is a credit bid, the party(s) submitting such

credit bid shall be required to pay the breakup fee in cash prior to closing on such credit bid.

(C)    Any person desiring to make a bid for all or substantially all of the Debtors' assets, or any portion thereof, (each a "Bidder," and collectively, the "Bidders") shall submit an originally-signed, written bid (each a "Bid," and collectively, the "Bids"), which shall be in the same form as the Stalking Horse APA except as to the consideration paid by the Bidder.

(D)    For purposes of these procedures, the "Bidding Receipt Agent" is Adam Hiller, Pinckney, Harris & Weidinger, LLC, 1220 North Market Street, Suite 950, Wilmington, Delaware 19801. At any time, the Debtors may change the identity and/or contact information for the Bidding Receipt Agent by filing a notice with the Court.

(E)    To be a "Qualified Bid," a bid must:

    (i)    Be a Bid (pursuant to the definition set forth above);

    (ii)    Be received (a) in its originally-signed, written form by the Bidding Receipt Agent on or before February 21, 2011 at 4:00 p.m. Eastern Time, (b) by mail (postage prepaid), in person (including but not limited to by courier), or by overnight delivery (such as by FedEx, UPS, DHL, or Express Mail), or (c) in such manner and by such date and time as the Debtors in their discretion shall agree in writing (the "Bid Deadline");

    (iii)    Contain an offer to purchase assets for cash and/or cash equivalent in a sum certain in excess of the Stalking Horse Bid plus the Breakup Fee;

    (iv)    Contain information which the Debtors, in their discretion after consultation with Branhaven[1] and the Committee, believe is adequate to describe the asset(s) proposed to be purchased, the consideration offered for the proposed purchase, and any other salient terms proposed in the Bid (a definitive asset purchase agreement is strongly recommended); provided that in the Debtors' discretion, a Bid which is not a Qualified Bid pursuant to the terms of this subparagraph when it is received can subsequently become a Qualified Bid in the event sufficient information is subsequently furnished and relate back to the date that the Bidding Receipt Agent received the original Bid;

---

[1] To extent that the Sale Procedures require or permit consultation with Branhaven, it is expressly conditioned upon Branhaven not submitting a Bid. Should Branhaven submit or intend to submit a Bid, it is not entitled to engage in any consultation with the Debtors or the Committee that are otherwise required or permitted in the Sale Procedures.

(v)     Contain the Bidder's agreement to become solely responsible to cure any and all defaults associated with any executory contracts and/or unexpired leases in connection with which the Bidder intends to receive an assignment, to the extent necessary to obtain approval of the assumption and assignment thereof under § 365 of the Bankruptcy Code;

(vi)    Be accompanied by a fully executed coversheet in the form attached hereto as **Exhibit A-1** (the "Bid Coversheet"); and

(vii)   Be accompanied by an earnest money deposit in the amount of 10% of the total purchase price stated therein (including as later supplemented, the "Deposit") in the form of a certified or bank check, wire transfer, or letter of credit, and provide that such Bid shall remain open and irrevocable until the end of the second business day following the closing of the Sale;

(viii)  Not be subject to any financing contingency, contingency relating to the completion of unperformed due diligence, contingency relating to further internal or external approvals or consents (other than approval of the Bankruptcy Court), and must state that it has been approved (subject to stated conditions) by any, and all, governing bodies or investors (e.g., board of directors or minority partners);

(ix)    To the extent that the Bid requires the assumption and assignment of any executory contracts and/or unexpired leases of the Debtors, be accompanied by information and assurances satisfactory to the Debtors that the Bidder can obtain all required consents, approvals, and licenses to fulfill the terms, conditions and obligations under any and all such executory contracts and unexpired leases, including but not limited to sufficient information to permit the Court, the Debtors, and any applicable lessors or counterparties to determine the Bidder's ability to comply with the requirements of § 365 of the Bankruptcy Code (to the extent applicable) in connection with them; and

(x)     Must clearly identify the Bidder, the person(s) for whom the Bid is submitted, all majority investors in and affiliates of the Bidder, and all connections that the Bidder has with the Debtors, any of the Debtors' employees, officers, or directors, Branhaven, and any of the Debtors' known competitors.

(F)     After the Bid Deadline, if the Debtors, in consultation with Branhaven and the Committee, determine that there is at least one Qualified Bidder other than the Stalking Horse, the Debtors shall conduct an auction (the "Auction") beginning on February 28, 2011 at 10:00 a.m. Eastern Time (the "Auction Date") and continuing until concluded. Only the Bidders

submitting such equivalently valued Qualified Bids shall participate in the Auction. Representatives of the Stalking Horse, Branhaven, the Committee, and the United States Trustee's office shall be permitted to attend the Auction. The Auction shall take place at the law offices of Pinckney, Harris & Weidinger, LLC, 1220 North Market Street, Suite 950, Wilmington, Delaware 19801, or at such other place as the Debtors shall give at least 48 hours' notice to each of the Bidders invited to participate. The Debtors, in consultation with Branhaven and the Committee, may establish such administrative rules regarding the conduct of the Auction as they deem appropriate, including but limited to, bidding increments, personal attendance requirements, adjournments, exclusion of visitors, the time allotted for making competing Bids, the sequence of submission of competing Bids, and the manner of making competing Bids.

(G)     At the beginning of the Auction, the Debtors, in consultation with Branhaven and the Committee, shall identify for all present participants which Bid the Debtors deem to be the highest and best Bid, which shall become the "Winning Bid" if no higher and better Bids are submitted and accepted by the Debtors (upon consultation with Branhaven and the Committee), and the Bidder making the Winning Bid is the "Winning Bidder." Thereafter, and subject to the other procedures set forth herein, each participating Bidder shall be permitted to make a competing Bid which (i) includes the same terms as such Bidder's previously submitted Bid but higher monetary payments, (ii) includes the same terms as any other Bidder's previously submitted Bid but higher monetary payments, or (iii) if (and only if) the Debtors, in consultation with Branhaven and the Committee, consent, different terms. In the event a Bidder makes a competing Bid that the Debtors do not consider a higher and better offer than a Bid previously submitted by any party, the Debtors may reject the Bid and, in their discretion, may (but shall not be required to) advise the Bidder how much higher such Bid would need in order to be deemed higher and bidder than the previously submitted Bids. The Bid at the Auction deemed by the Debtors to be the highest and best offer for the Debtors' assets is the Winning Bid and the Bidder making the Winning Bid is the Winning Bidder. By submitting a Bid, each Bidder agrees that it lacks standing to object to the Debtors' determination that its Bid or any other Bid constitutes the Winning Bid. Every Bidder submitting a Bid at the Auction shall be deemed to agree that if it is the successful bidder at the Auction, such Bidder shall provide the Debtors with a supplemental deposit which, when added to the initial Deposit payment, shall be 10% of the total Winning Bid.

(H)     Immediately prior to the conclusion of the Auction (except to the extent otherwise agreed by the Debtors and the Bidder making the Winning Bid), the Bidder or Bidders making the Winning Bid shall sign all agreement(s), contract(s), instrument(s) or other document(s) evidencing and containing the terms and conditions upon which such bid was made, if it has not already done so.

(I)     In addition to selecting the Winning Bid, the Debtors, in consultation with Branhaven and the Committee, shall select the Bid (whether submitted at the Auction or in accordance with the Sale Procedures described above) which, other than the Winning Bid, constitutes the highest and best offer (the "Next Highest Bid" and the Bidder making such Bid is the "Next Highest Bidder").

(J)     Except with respect to the Stalking Horse or as otherwise provided in these Sale Procedures or further order of the Court, neither the Debtors nor their estates shall be responsible to any person for breakup fees, brokers' fees, or "finder's fees," and all Bidders shall conduct whatever due diligence they require solely at their own expense, and all participation in the Sale, including but not limited to the Auction, shall be at each Bidder's sole expense.  The Debtors shall not be required to furnish any Bidder with any overbid protections.

(K)     The Debtors, in consultation with Branhaven and the Committee, reserve the right to reject at any time prior to the entry of an order of the Court approving a sale of the Debtors' assets, any offer which the Debtors deem to be (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, or the terms and conditions of the Sale set forth herein, or (iii) contrary to the best interests of the Debtors, their estates, and their creditors. The Debtors will have no obligation to accept or submit for Court approval any offer presented prior to, at, or after the Auction.

Sale Hearing.

(L)     A hearing to consider approval of the Sale (the "Sale Hearing") shall be conducted by the Court on **March 9, 2011 at 10:30 a.m. (Eastern Time)** or at such other time as the Court permits.  In the event the Court desires to approve the Sale, the Court will enter an order approving the Sale (the "Sale Order").

(M)     Subject to entry of the Sale Order, the Debtors shall sell, and the Winning Bidder shall purchase, the agreed portion of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances, in accordance with the terms of the Winning Bid, and closing shall occur on or before March 4, 2011 at 2:00 p.m. (the "Closing Date").

(N)     In the event the Winning Bidder fails to consummate the Sale on or before the Closing Date, or in the event the Winning Bidder repudiates its obligation to consummate the Sale prior to the Closing Date, the Next Highest Bidder will be deemed to be the Successful Bidder for purposes of the Sale Order, and the Debtors shall be authorized, but not required, to consummate the Sale with the Next Highest Bidder in accordance with the

terms of the Next Highest Bid without further order of the Court. In such case, the Winning Bidder's Deposit shall be immediately forfeited to the Debtors, and the Debtors reserve the right to seek any further damages from the Winning Bidder on account of the default.

(O)     Except as expressly provided in the Bid, any Sale of the Debtors' assets shall be without representation or warranties of any kind, nature or description by the Debtors, their agents, or their estates, and all such assets shall be transferred "as is," "where is," and "with all faults." THE DEBTORS EXPRESSLY DISCLAIM, AND SHALL BE DEEMED TO HAVE DISCLAIMED, ANY AND ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE DEBTORS MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.

Procedures Relating to Deposits.

(P)     All Deposits (except those of the Winning Bidder and Next Highest bidder) shall be subject to the jurisdiction of this Court and, except as otherwise provided herein, shall be returned by the Debtors to the unsuccessful bidders as soon as reasonably practicable after the closing of the Sale, except as otherwise provided herein.

(Q)     All Deposits shall be held by counsel for the Debtors in counsel's attorney trust fund account, or in the Debtors' discretion, by a third-party escrow agent (either, a "Custodian") in a segregated, non-interest-bearing bank account. In the event of a dispute concerning the Debtors' right to retain any Deposit, the Custodian shall have no liability to any bidder for the failure to return such Deposit to the bidder, and the bidder's sole remedy shall be to seek relief from this Court to compel the return of the Deposit. In the event of a dispute, the Custodian may interplead the Deposit (or any disputed portion thereof) into the registry of the Court subject to further order. In the event the Custodian, in its discretion, deems it necessary or appropriate to interplead such funds into the registry of the Court, the Custodian may surcharge its costs, including reasonable attorneys' fees, against such funds, after Court approval.

Reservation of Rights.

(R)     The Debtors reserve the right to: (i) impose at or before the Auction such other and additional terms and conditions as may be in the interest of the Debtors, their estates, and their creditors (so long as such terms are not materially inconsistent with the terms of the Sale Procedures); (ii) extend the deadlines set forth in the Sale Procedures; (iii) adjourn the Auction at or before the Auction; (iv) adjourn the Sale Hearing without further notice by making an announcement in open court or by the filing of a hearing

agenda pursuant to Bankr. D. Del. L.R. 9029-3 containing notice of the adjournment; (v) waive any terms or conditions set forth in these Bidding Procedures (so long as such waiver is not materially inconsistent with the terms of the Sale Procedures) except as otherwise required under the Bankruptcy Code or Bankruptcy Rules; and (vi) withdraw from the Auction some or all of the Debtors' assets at any time prior to or during the Auction or cancel the Auction.

<u>Treatment of Unexpired Leases and Executory Contracts</u>.

(S) The following procedures shall apply to each of the Debtors' unexpired leases and executory contracts that the Debtors may assume and assign to the Purchaser in conjunction with the Sale (each an "Assigned Contract" and collectively, the "Assigned Contracts"):

    (i) The Debtors shall cause the Notice of the Potential Assumption and Assignment of Executory Contracts and Unexpired Leases, in substantially the form annexed hereto as **<u>Exhibit A-2</u>** (the "Assumption Notice"), to be served by first-class mail on all non-debtor parties to the Assigned Contracts on or before two business days after the entry of the Procedures Order.

    (ii) The Debtors shall attach to the Assumption Notice its calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all defaults under each of the Assigned Contracts (each a "Proposed Cure Amount" and collectively, the "Proposed Cure Amounts"). Unless a specified cure amount is stated, the Proposed Cure Amount for any particular non-debtor counterparty to an Assigned Contract is deemed to be $0.00.

    (iii) To the extent that the non-debtor party to an Assigned Contract does not (a) file with the Court an objection (the "Contract Objection") to the assumption and assignment of the Assigned Contract (other than with respect to the adequacy of assurance of future performance by the Purchaser of such Assigned Contract) and/or the scheduled Proposed Cure Amount by 4:00 p.m. (prevailing Eastern Time) on the business day prior to the Auction (the "Contract Objection Deadline") and (b) serve a copy of the Contract Objection by electronic mail or facsimile, with the originally-signed copy to follow by mail on that same day, upon counsel for the Debtors and counsel for the Committee, such non-debtor counterparty, and all person on his/her/its behalf, shall (a) be forever barred from objecting to, and shall be deemed to consent to, the Debtors' assumption of the Assigned Contract and assignment of same to the Purchaser, (b) be forever barred from objecting to, and shall be deemed to consent to, the Proposed Cure Amount and from asserting any additional cure amount or other defaults with respect to the applicable Assigned Contract. Except to the extent

set forth in a timely Contract Objection, the Debtors, the Purchaser, and all parties in interest shall be entitled to rely solely upon the Proposed Cure Amount as the exclusive amounts due under every Assigned Contract as of the Closing Date, and all parties shall be forever barred and estopped from asserting or claiming against the Debtors and the assignee of the Assigned Contract that any additional amounts are due or defaults exist, or that additional conditions to assumption and assignment must be satisfied under such Assigned Contract.

(iv)     <u>Adequate Assurance</u>. Within two business days after a Winning Bid is selected, the Debtors shall provide notice to the non-debtor counterparty to each executory contract and unexpired lease of the identity of the Winning Bidder, any materials furnished by the Winning Bidder in connection with adequate assurance of future performance, and the name and telephone number of a representative of the Winning Bidder from whom such counterparty can request additional information. The Winning Bidder shall provide any reasonably requested information, and in the event the assignment to the Winning Bidder of any Assigned Contract(s) is denied solely due to the inability of the Debtors to demonstrate adequate assurance of future performance, the Winning Bidder shall neither be excused from consummating the Sale nor entitled to a purchase price adjustment for the exclusion of such Assigned Contract(s). To the extent that the non-debtor party to an Assigned Contract does not (a) file with the Court an objection (the "Adequate Assurance Objection") to the adequacy of assurance of future performance by the Purchaser by 12:00 p.m. (prevailing Eastern Time) on the business day prior to the Sale Hearing (the "Adequate Assurance Objection Deadline") and (b) serve a copy of the Adequate Assurance Objection by electronic mail or facsimile, with the originally-signed copy to follow by mail on that same day, upon counsel for the Debtors and counsel for the Committee, such non-debtor counterparty, and all person on his/her/its behalf, shall (a) be forever barred from objecting to, and shall be deemed to consent to, the Debtors' assignment of the Assigned Contract to the Purchaser, (b) be forever barred from objecting to, and shall be deemed to consent to, the adequacy of assurance of future performance by the Purchaser.

<u>AUTHORITY FOR RELIEF REQUESTED</u>

A.      <u>AUTHORITY FOR DEBTORS' SALE OF ASSETS</u>.

21.     Section 363(b) of the Bankruptcy Code provides authority for a trustee and, through the application of § 1107(a), a debtor-in-possession, "after notice and a hearing, [to] use,

sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The authority to sell assets conferred upon a debtor by § 363(b) "include[s] a sale of substantially all the assets of an estate."  Otto Preminger Films, Ltd. v. Ointex Entm't, Inc. (In re Ointex Entm't, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991). Further, § 105(a) of the Bankruptcy Code allows the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

22.     A bankruptcy court's power to authorize a sale under § 363(b) is to be exercised at the court's discretion. In re WPRV-TV, Inc., 983 F.2d 336, 340 (1st Cir. 1993); New Haven Radio, Inc. v. Meister (In re Martin-Trigona), 760 F.2d 1334, 1346 (2nd Cir. 1985); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2nd Cir. 1983).

23.     Courts in the Third Circuit, as well as other courts, have authorized the sale of all or substantially all of a debtor's assets pursuant to § 363(b) of the Bankruptcy Code or in the absence of a reorganization plan where there is a "sound business purpose." In re Del. & Hudson Rv. Co., 124 B.R. 169 (D. Del. 1991); Titusville Country Club v. Penn Bank (In re Titusville Country Club), 128 B.R. 396 (Bankr. W.D. Pa. 1991); See also Stephens Indus., Inc. v. McClune, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test in the context of a sale of assets under § 363(b)).  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071

24.     Here, the "sound business purpose" test is easily met because the Debtors are simply unable to sustain their operations through a protracted reorganization proceeding. If the

Debtors cannot establish an aggressive and effective schedule for obtaining approval and consummation of a sale, the Debtors will have no option but to shut down their operations at a significant cost to their creditors. It is therefore very much in the interests of creditors to realize value now, prior to any further deterioration.

25.    Additionally, the Sale is being proposed to maximize the amount of money that will be realized from disposing of the Debtors' assets. At present, the Debtors' only alternatives to an immediate sale of assets are a plan or a fire-sale liquidation. If the Sale Procedures do not generate a proposed purchaser offering at least as much as the Debtors believe will be generated in a piecemeal liquidation, that option will be no less viable after the sale process.

26.    The Debtors are advised, moreover, that Neogen Corporation is a publicly traded company with a market capitalization of approximately $900 million and had annual revenues in excess of $140 million last year. The Debtors' management is familiar with Neogen and is comfortable with its ability to close promptly on the transaction if it is the winning bidder. The Debtors are advised that the company has approximately $40 million of cash on its balance sheet and has successfully completed 18 acquisitions over the last 10 years.

27.    Courts also require that the sale price be fair and reasonable and that the sale be the result of good faith negotiations with the buyer. In re Abbotts Dairies of Pa., 788 F.2d 143, 147-50 (3rd Cir. 1986); In re Tempo Tech. Corp., 202 B.R. 363, 367 (D. Del. 1996), aff'd sub nom. Diamond Abrasives Corp. v. Temtechco. Inc. (In re Temtechco, Inc.), 141 F.3d 1155 (3rd Cir. 1998); In re Stroud Ford, Inc., 163 B.R. 730 (Bankr. M.D. Pa. 1983); See also In re Ewell, 958 F.2d 276 (9th Cir. 1992) (declining to set aside or modify a sale pursuant to section 363 of the Bankruptcy Code because the price was fair and reasonable and the buyer was a good faith purchaser pursuant to § 363(m) of the Bankruptcy Code).

28.     While the Bankruptcy Code does not define "good faith," courts in the Third Circuit have held that for purposes of § 363(m), a "good faith purchaser" is one who buys "in good faith" and "for value" and that lack of good faith is shown by fraud, collusion, or an attempt to take grossly unfair advantage of other bidders. In re Abbots Diaries of Pa., 788 F.2d at 147; In re Tempo Tech. Corp., 202 B.R. at 367.

29.     Any Bid treated as the Winning Bid will, by virtue of the procedures, be the product of good faith and arms-length negotiations between the Debtors and the Purchaser.[2]  The price and the form and structure of the offer proposed by the Winning Bidder will have been tested in the marketplace, because all reasonably known potential purchasers will have had an opportunity to submit a bid.  In the Debtors' opinion, the Bidding Procedures are intrinsically fair to all parties and are designed to permit the Debtors to obtain the best possible price.  Thus, the Debtors are confident that the Winning Bid that emerges from this process will truly be the highest and best bid obtainable for the Purchased Assets.

30.     The Debtors respectfully submit that the proposed sale of the Debtors' assets is entirely consistent with the guidelines set forth by the Third Circuit. The Debtors believe that a prompt sale is in the best interest of the Debtors, their creditors, and their estates and will maximize the amount that the Debtors, their creditors, and their estates may realize for the value of the Debtors' assets.  The terms and conditions of the Auction and the Bidding Procedures are fair and reasonable.

31.     Additionally, § 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or

---

[2] To the extent that any insiders of the Debtors may be benefited by the terms of any Bid, the Debtors will make arrangements to exclude such insiders from consideration of the value of such Bid as against other Bids, except insofar as the only difference between the Bids is measurable by cash-based consideration.

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its § 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to § 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian). 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

32.     Therefore, the Bidding Procedures and the Sale should be approved.

B.     AUTHORITY FOR BREAKUP FEE

33.     The Debtors have agreed with the Stalking Horse to the inclusion of a Breakup Fee in the Bidding Procedures. It is well-established the "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's length negotiations." In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992).

34.     Here, the proposed Breakup Fee is the product of good faith, arm's length negotiations between the Debtors and the Stalking Horse. The Breakup Fee is fair and reasonable in proportion to the time, effort, cost, and expenses incurred and to be incurred by the Stalking Horse in negotiation the Stalking Horse APA and the aggregate consideration to be paid by the Stalking Horse thereunder. If higher and better offers for the assets are received, it will be

because the Stalking Horse has generated interest among other parties participating in the Auction.

35.     Fees such as those proposed here encourage an interested party such as the Stalking Horse to expend substantial money, time, and effort to negotiate with a debtor, notwithstanding that the transaction is subject to the risks presented by a pending Chapter 11 case and uncertainty as to the approval of the transaction by the Court.   Under these circumstances, the Debtors believe that the Topping Fee is reasonable and appropriate and should be approved.

C.      AUTHORITY FOR SALE FREE AND CLEAR.

36.     The Debtors request authorization for the sale of their assets to be free and clear of liens, claims and encumbrances and other interests. Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property under § 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (a)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (b)     such entity consents;
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)     such interest is in bona fide dispute; or
>
> (e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by § 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White

Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

38.     Here, the only known holder of liens, claims, interests or other encumbrances on or against the Debtors' assets are the Secured Creditors, including Branhaven. Although no written agreement has been executed, the Debtors expect that the sale will be free and clear with Branhaven's consent and the relief requested should thus be approved.

39.     Moreover, the Debtors are not aware of any other holder of liens, claims, interests or other encumbrances on or against the Debtors' assets. To the extent any person asserts liens, claims, interests or other encumbrances on or against the Debtors' assets, they are disputed by the Debtors. Furthermore, even if valid, liens, claims, interests or other encumbrances exist on any of the Debtors' assets, they are likely to be junior to those of Branhaven, and unless the purchase price for the assets exceeds the total claims asserted by Branhaven, such liens, claims, interests or other encumbrances are worth $0.00. Therefore, under applicable non-bankruptcy law, Branhaven could have foreclosed upon the assets and sold them free and clear of such junior liens, claims, interests or other encumbrances.

40.     A sale of the Debtors' assets other than one free and clear of liens, claims, interests and other encumbrances would be of substantially less benefit to and would adversely affect the Debtors' bankruptcy estates. Upon information and belief, no potential Bidder would submit a bid for any of the Debtors' assets if it believes that Branhaven or another party in interest will foreclose upon a senior lien on them.

41.     Therefore, grounds exist to authorize the Debtors to sell their assets free and clear of liens, claims, interests, and other encumbrances.

D.    THE SALE IS IN GOOD FAITH PURSUANT TO § 363(M).

42.    As discussed above, the "good faith" prong of the Abbotts Dairies standard is also satisfied here. The Debtors request that the Court expressly determine that the Purchaser is entitled to the benefits and protections provided by § 363(m) of the Bankruptcy Code in connection with the Sale.

43.    Section 363(m) of the Bankruptcy Code provides, in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . of property does not affect the validity of a sale ... under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

44.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to § 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, § 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, the Third Circuit has indicated that § 363(m) also protects the assignee of a debtor's interest in executory contracts under § 365 of the Bankruptcy Code. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3rd Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under § 365 of the Bankruptcy Code, the Court in Krebs concluded that § 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Assigned Contracts are executory contracts that may be assumed and assigned pursuant to § 365 of the Bankruptcy Code. In light of Krebs, the Debtors

respectfully submit that § 363(m) applies to protect the Purchaser with respect to the Assigned Contracts, in addition to any other purchased assets.

45.     As required by § 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the Assigned Contracts. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing § 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

46.     Here, the sale of assets and the assignment of executory contracts is in good faith. There is no evidence of fraud or collusion.  To the contrary, the Sale will be the culmination of a solicitation process in which all parties are expected to be sophisticated and represented by professionals.  No known potential bidder is an insider of the Debtors, as that term is defined in § 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms-length, good-faith basis. Under the circumstances, the Purchaser should be afforded the protections that § 363(m) of the Bankruptcy Code provides to a good-faith purchaser. Furthermore, the solicitation efforts made by the Debtors and the Bidding Procedures

are designed to prevent the Debtors, the Purchaser, or any Bidders from engaging in any conduct that would cause or permit the Sale to be avoided under § 363(n) of the Bankruptcy Code.

47.     All parties in interest will receive notice of the proposed Sale and will be provided with an opportunity to be heard. Additionally, all counterparties to the Assigned Contracts will be provided notice of the proposed assumption and assignment and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under §§ 363(b) and 365 of the Bankruptcy Code.

E.      THE COURT SHOULD AUTHORIZE THE ASSUMPTION AND ASSIGNMENT OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

48.     As noted above, to facilitate and effect the Sale, the Debtors seek authority to assume and assign the Assigned Contracts to the Purchaser to the extent required under the Winning Bid.  To the extent not required to consummate the Sale, the Debtors seek authority to reject any remaining unexpired leases and/or executory contracts.

49.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that any defaults are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(b). A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. Rv. Co., 318 U.S. 523 (1943) (applying § 77(b) of the Bankruptcy Act of 1897); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

50.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-606 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

51.     In this case, a Bidder may seek to receive an assignment of certain executory contracts and/or unexpired leases as part of its Bid, and the Bidder shall be solely responsible for any cure obligations arising from the proposed assumption and assignment.  The Debtors will take the amount necessary for a cure into account when evaluating the value of the Bid and determining whether it, or another Bid or no Bid, constitutes the highest and best offer for their assets.  For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that assuming and assigning the Assigned Contracts to the Purchaser as part of the Sale will be in the best interests of their bankruptcy estates.

52.     Moreover, as noted above, the Debtors will provide the non-debtor parties to the Assigned Contracts an opportunity to be heard.  Specifically, a notice identifying any Assigned Contracts will be provided to each such non-debtor party, identifying the Debtors' proposed cure amount.  Each such non-debtor party will receive notice as soon as reasonably practicable to object to the proposed assumption, the proposed assignment, the proposed cure amount, and/or the adequacy of assurance of future performance.  If no such objection is received, the assignment of the applicable Assigned Contracts, and their respective cure amounts, will be approved and fixed.

53.     For the foregoing reasons, the Debtors respectfully submit that the assumption and assignment of the Assigned Contracts should be approved.

G.     RELIEF FROM THE 14-DAY WAITING PERIODS UNDER BANKRUPTCY <u>RULES 6004(H) AND 6006(D) IS APPROPRIATE</u>.

54.     Fed. R. Bankr. P. 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Fed. R. Bankr. P. 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 7062 further provides a stay of proceedings to enforce a judgment. The Debtors request that the Sale Order be effective immediately by providing that the 14-day stays under Fed. R. Bankr. P. 6004(h), 6006(d) and 7062 are waived.

55.     The purpose of Fed. R. Bankr. P. 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Fed. R. Bankr. P. 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

56.     In this case, it is of the utmost importance that the Sale be authorized to proceed immediately upon entry of the Sale Order. The Debtors' cashflow is projected to have ended by the time of the Sale, so any further delay may cause or increase any administrative insolvency

under which the Debtors operate and render them unable to meet their own operational needs, including but not limited to such basic needs as payroll, rent, and transactional costs. The Sale itself may be jeopardized if the Debtors cannot meet these needs.

57.     Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Fed. R. Bankr. P. 6004(h), 6006(d) and 7062.

<u>NOTICE</u>

58.     Notice of this Motion has been served upon: (i) counsel to the Stalking Horse, (ii) counsel to Branhaven, (iii) counsel to the Committee; (iv) the attorney for the United States Trustee; and (v) all parties requesting notice under Del. Bankr.LR 2002-1. Notice of the proposed Sale will also be served upon all known creditors of the Debtors, including but not limited to the counterparties to any unexpired leases and/or executory contracts that might be affected by the Sale. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested hereinabove, by:

(A)  Entering the Procedures Order, substantially in the form of **Exhibit A** attached hereto;

(B)  Entering the Sale Order, substantially in the form of **Exhibit B** attached hereto; and

(C)  Granting the Debtors such further relief as this Court deems just and proper.

Dated: January 12, 2011           Respectfully submitted,
Wilmington, Delaware

PINCKNEY, HARRIS & WEIDINGER, LLC

 **/s/ Adam Hiller**
Adam Hiller (DE No. 4105)
Donna L. Harris (DE No. 3740)
1220 North Market Street, Suite 950
Wilmington, Delaware 19801
(302) 504-1497 telephone
(302) 442-7046 facsimile

*Attorneys for the Debtors*