**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| METAMORPHIX, INC., *et al.*, | ) | Case No. 10-10273 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | **Hearing date: January 25, 2011 @ 10:30 am** |
| | ) | **Objection deadline: January 21, 2011 @ 4:00 pm** |

**OBJECTION OF BRANHAVEN LLC TO DEBTORS' MOTION FOR (I) APPROVAL OF SOLICITATION PROCEDURES, BIDDING PROCEDURES, SALE PROCEDURES, INCLUDING FORM AND MANNER OF NOTICE OF SALE, AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT, OR IN THE ALTERNATIVE REJECTION, OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS; (II) APPROVAL OF ASSUMPTION AND ASSIGNMENT, OR IN THE ALTERNATIVE REJECTION, OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) APPROVAL OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES ( RE. D.I. 217)**

Branhaven LLC, as Collateral Agent (the "Agent") for all holders of 12.5% secured promissory notes issued by debtor MetaMorphix, Inc. ("MMI"), by and through the undersigned counsel, submits this, its Objection to the *Debtors' Motion For (I) Approval Of Solicitation Procedures, Bidding Procedures, Sale Procedures, Including Form And Manner Of Notice Of Sale,and Procedures For The Assumption and Assignment, Or In The Alternative Rejection, Of Executory Contracts And Unexpired Leases Of The Debtors; (Ii) Approval Of Assumption And Assignment, Or In The Alternative Rejection, Of Executory Contracts And Unexpired Leases; And (Iii) Approval Of Sale Of Substantially All Of The Debtors' Assets Free and Clear Of Liens, Claims, Interests And Other Encumbrances* (the "Sale Motion ") [D.I. 217] for the reasons set forth herein.

137931_2.doc

**INTRODUCTION**

There is substantial evidence demonstrating that Debtors are in dire financial straits, are burning through cash, are administratively insolvent and are continuing to accrue massive administrative expenses that will never be paid, and are being mismanaged due in part to a substantial lack of revenue. The stark reality is that Debtors' unsecured creditors likely will not receive any distribution in this bankruptcy case. Prior liens on Debtors' assets total more than $62,000,000.00, and the Debtors continue to accrue administrative expenses. Neogen Corporation's opening $4,000,000.00 stalking-horse bid, does not remotely come close to paying Debtors' secured creditors in full. Debtors' reorganization or a sale of assets under section 363 of the Bankruptcy Code will only add to the massive administrative expenses in this case and is not in the best interest of the creditors.

**BACKGROUND/OVERVIEW**

Certain petitioning creditors[1] filed an involuntary petition against MMI (seeking an order for relief under Chapter 7) on January 28, 2010 (the "Petition Date"). MMI filed its *Answer to the Involuntary Petition* [D.I. 8] on March 10, 2010, then filed a *Motion Pursuant to 11 U.S.C. § 305(a) to Suspend Involuntary Chapter 7 Proceedings* (the "Motion to Suspend") [D.I. 9] on March 17, 2010.

*A.*     *OF THIS CASE*

The Court entered an order for relief under Chapter 11 of the Bankruptcy Code on September 30, 2010.

---

[1] These are Brio Capital, LP, Gunther 93 Family Trust, Martin & Howard Weiss, Weiss Access 360 Trust, DYM Enterprise, Inc., Dana Donnell, Ted Donnell, Dan Donnell, Northwest Property Management, Kurt B. Schneiter, Alpha Capital Anstalt, and Bryan J. and Sandra R. Hutcheson (collectively, the "Petitioning Creditors").

Debtor directly owns or controls four subsidiaries: MMIG, MetaMorphix Holdings, Inc., MetaMorphix International, Inc., and MetaMorphix Canada, Inc. (collectively, the "Subsidiaries").

MMIG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, bearing case number 10-13775. On November 30, 2010, the Court entered an order authorizing the joint administration of Debtors' cases [D.I. 153]. None of the remaining Subsidiaries is a debtor in any pending bankruptcy case.

B.   *OF THE DEBTOR'S FINANCING*

Prior to the Petition Date, MMI issued a series of convertible debt notes, some of which have been converted into equity and others of which have been reissued as newer series notes. Among other obligations, MMI issued approximately $15,000,000.00 of Convertible Secured Promissory Notes bearing interest at 12.5% per annum. The obligations are described as the "12.5% Notes"; the holders of the 12.5% Notes being the "12.5% Noteholders." There are dozens of 12.5% Noteholders, and the relevant 12.5% Notes are the same but for the name, date, and amount on each 12.5% Note.

To induce the 12.5% Noteholders to make the loans represented by the 12.5% Notes, and as additional security therefor, MMI and the Subsidiaries executed a Security Agreement (the "Security Agreement") on November 7, 2003. MMI and the Subsidiaries granted to Maroon Bells Capital, LLC, the former agent for the 12.5% Noteholders (the "Former Agent"), for the benefit of the 12.5% Noteholders, a continuing security interest and lien in and to all of MMI's and the Subsidiaries' respective assets of any kind and nature, whether now existing or hereafter acquired, as more fully described in the Security Agreement (collectively, the "Collateral.

The Former Agent evidenced and perfected the 12.5% Noteholders' security interest in the Collateral by filing a financing statement with the Delaware Department of State. The Former Agent subsequently resigned. To fill the vacancy and relying upon statements by MMI and its counsel to the effect that only the initial tranche of 12.5% Noteholders was secured, the 12.5% Noteholders appointed Christopher Paxos as their successor agent to the Former Agent. The 12.5% Noteholders subsequently appointed the Agent as their successor agent to Mr. Paxos and notified the Court of same. [D.I. 177].

The 12.5% Notes, the Security Agreement, and all other documents executed by MMI in connection with the 12.5% Notes evidencing the indebtedness and obligations owed by MMI to the 12.5% Noteholders are collectively referred to as the "Loan Documents."

C. OF DEBTORS' FAILED EFFORTS TO RESTRUCTURE AND OBTAIN DEBTOR-IN-POSSESSION FINANCING

Beginning in October 2009, MMI and its creditors, including the 12.5% Noteholders, entered into negotiations to restructure MMI's debt. During that time, MMI engaged in repeated discussions with all creditor groups and thoroughly investigated and sought various restructuring alternatives, including the possible filing of a pre-packaged bankruptcy case and obtaining debtor-in-possession ("DIP") financing. In fact, so that the parties could continue to negotiate, the Motion to Suspend was continued on seven (7) occasions until it was finally heard on September 30, 2010. MMI's restructuring efforts were nevertheless unsuccessful.

The 12.5% Noteholders have been involved in every aspect of Debtors' attempts to formulate a viable restructuring plan and secure DIP financing. In the months prior to the Petition Date, the 12.5% Noteholders communicated with MMI's management on an almost daily basis. During these ongoing negotiations, seven different restructuring proposals that included DIP financing were circulated among the creditor groups to no avail. To secure DIP

financing and complete a restructuring under a pre-packaged bankruptcy, the 12.5% Noteholders conducted weekly conference calls with MMI's management to discuss DIP financing. The 12.5% Noteholders and MMI's management exchanged hundreds of telephone calls and e-mail messages in an ongoing effort to build consensus and to secure DIP financing for MMI. Multiple DIP financing and restructuring proposals were made by various parties, including unsecured creditors, yet all were rejected by one party or another.

The parties employed every available measure. For example, MMI's management raised the amount of the required DIP financing to attract larger DIP lenders and alternatively presented scaled down budgets to make a DIP loan more attractive to smaller investors. Eight different term sheets were circulated among the parties, but these efforts, too, proved unsuccessful.

In a final effort to secure DIP financing in August 2010, some of the senior and junior noteholders engaged in negotiations to provide joint DIP financing. These efforts also were unsuccessful. To date, Debtors still have not arranged for DIP financing.

Under this background in which MMI has failed to solve its financial problems despite approximately 15 months of restructuring efforts, there is a real danger of administrative insolvency. Debtors have incurred substantial vendor and unsecured debt, and, upon information and belief have incurred at least $500,000.00 in wage debt[2] which would be entitled to priority under section 502(f) of the Bankruptcy Code. Indeed, Debtors' former bankruptcy counsel, Whiteford Taylor & Preston LLP, has filed a priority proof of claim in the amount of $259,158.08. (Claims Register, Claim No. 11).

---

[2] Without explanation for the amounts scheduled, MMI's bankruptcy Schedule F lists Edwin C. Quattlebaum, Ph.D., the company's president and chief executive officer, as a creditor holding unsecured claims of $510,731.00, $431,767.00, and $30,882. In addition, MMI's Schedule E contains a claim for Dr. Quattlebaum of $315,000.00 in wages in vacation, of which $11,725 is scheduled as a priority claim.

5

Notwithstanding Debtors' recent requests to retain special counsel and investment bankers, a reorganization of Debtors or a sale of assets under section 363 of the Bankruptcy Code, would simply add another layer of administrative expenses to Debtors' estates.

The 12.5% Noteholders are senior to any subsequent noteholder and remain the only noteholders who have a perfected security interest in all of MMI's and the Subsidiaries' now existing or later acquired assets. As of December 31, 2010, Debtors' obligations to the 12.5% Noteholders total $34,316,735.71 in principal and interest and its obligations to the holders of promissory notes bearing interest at 10% per annum total $27,930,475.34 in principal and interest. Put simply, prior liens on Debtors' assets totaling $62,247,211.05 and the substantial administrative claims against Debtors that continue to pile up unpaid will consume any possible recovery for anyone other than the 12.5% Noteholders. In fact, Neogen Corporation's opening $4,000,000.00 stalking-horse bid will not even remotely cover the 12.5% Noteholders' claims.
.

## CONCLUSION

For the foregoing reasons, the Court should deny the Sale Motion.


Dated: January 21, 2011
Wilmington, Delaware

                                            Respectfully submitted,
                                            **MARGOLIS EDELSTEIN**

                                            /s/ James E. Huggett
                                            James E. Huggett, Esquire (#3956)
                                            Amy D. Brown, Esquire (#4077)
                                            750 Shipyard Drive, Suite 102
                                            Wilmington, Delaware 19801
                                            (302) 888-1112 telephone
                                            (302) 888-1119 facsimile

                                            -and-

LEITESS LEITESS FRIEDBERG + FEDDER PC
Steven N. Leitess, Esquire
Gordon S. Young, Esquire
One Corporate Center
10451 Mill Run Circle, Suite 1000
Baltimore, Maryland 21117

Counsel to BRANHAVEN LLC, AS AGENT
FOR THE 12.5% NOTEHOLDERS